# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Criminal Action No. 3:05-cr-00028 |
| | ) | |
| v. | ) | **2255 MEMORANDUM OPINION** |
| | ) | |
| BARBARA CORBY MARTIN. | ) | By: Norman K. Moon |
| | ) | United States District Judge |

Barbara Corby Martin, a federal inmate proceeding pro se, brings this Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255. She challenges the validity of her confinement pursuant to the judgment of this Court sentencing her to a term of 180 months following her conviction of arson, using fire to commit mail fraud, mail fraud, and making false statements to government investigators. The United States filed a motion to dismiss, arguing that Martin is not entitled to relief under § 2255. Martin responded, making the matter ripe for disposition. Upon review of the record, the Court finds that the motion to dismiss must be granted.

**I.     Procedural History and Background**

The facts surrounding Martin's crimes, convictions, and sentence are as stated by the Court of Appeals in its opinion on her direct appeal, United States v. Martin, 523 F.3d 281 (2008), cert. denied 129 S. Ct. 238 (2008):

> From 1998 through 2003, Martin owned and operated the Swissway Market, a small convenience store located in Scottsville, Virginia, that was damaged by a fire in October 2003. At the time of the fire, both Martin's business and her personal financial affairs were in significant distress.
>
> In 2003, the Swissway Market operated at a net loss of approximately $165,487, fell in arrears on its lease (and was three months late at the time of the fire), routinely issued checks that were refused for insufficient funds, and lost check writing

privileges on its Sam's Club account. Additionally, because of continuing overdraft problems, the Albemarle First Bank closed Swissway Market's business account. Within a few weeks of the fire, the Swissway Market lacked sufficient operating funds, rendering it unable to pay suppliers and vendors, stock its shelves, or compensate its employees. . . .

Individually, Martin owed approximately $109,000 in unpaid state taxes at the time of the fire, including interest and penalties, as well as at least $17,000 in unpaid federal taxes. In the months leading up to the fire, Martin consulted David Way, a CPA, to help her negotiate with Virginia tax authorities regarding Virginia's tax amnesty date on November 3, 2003. Pursuant to this tax amnesty plan, Virginia forgave various penalties and liabilities if the debtor arranged to satisfy the debt before November 3. The fire, as it turned out, occurred about one week before the amnesty date. There were numerous additional problems as well. Martin, having failed to pay her municipal business license fees or meal taxes for a number of years, was threatened with legal action in September 2003. Collectively, Martin and the Swissway Market owed $119,264 in debts over and above any available funds. With her financial problems mounting, Martin explored selling the business and, a few months before the fire, located a potential buyer. Unfortunately, the sale of her business never came to fruition, and Martin openly expressed her dislike of the business and the town and her desire to "torch" the building "if she had the guts." J.A. 134. At one point, Martin hinted that "it's not going to be long and I'm not going to have to worry about any of it anyway." J.A. 135. About two weeks before the fire, in fact, Martin removed her computer from the store. Later, she told a friend that certain items of furniture had been removed from the store on the day before the fire.

On October 28, 2003, the day of the fire, Martin climbed into the store's loft, where various records, invoices and supplies were stored. The loft was accessible to Martin and her employees only by use of a free-standing ladder. Shortly before lunch, Swissway Market employee Gloria Poe held the ladder in place for Martin, who indicated she needed to get paper bags from the loft for the lunch crowd. When Martin climbed back down, however, she did not have any bags.

Several hours later . . . Martin was still on the premises along with her boyfriend, Tom Snoddy, who drove her to the store. Snoddy entered the store at some point but returned to the car to wait for Martin, who exited the store at approximately 10:30 p.m.

Martin then told Snoddy she forgot to turn off the lights and returned by herself to the store for fifteen to twenty minutes. After she returned to the car, Snoddy drove around the building to inspect a security camera that he had installed; however, Martin became agitated and told Snoddy they had to leave immediately so she could search for a tax document at home.

At approximately 11:15 p.m., a passerby noticed a fire burning through the roof of the Swissway Market and called 911. When firefighters arrived at the scene fifteen minutes later, the fire was raging twenty feet above the roof line. Firefighters noticed that the door to the loft was partially open and that the ladder was back inside and positioned to provide access to the loft. . . .

Shortly after the fire, Martin filed a claim on a business owner's policy issued by Hanover Insurance Company that covered the contents of the Swissway Market and any income lost as a result of a covered event. Martin mailed the claim notice and Hanover, on November 7, 2003, issued Martin a check for $25,000. Martin later filed an official proof of claim, including her sworn statement that the "loss did not originate by any act, design or procurement on the part of the insured or this affiant." J.A. 38. The policy limit was $105,000, and Martin expected to receive the balance of these proceeds at some point in the future.

Following the fire, Martin and Way discussed her using the insurance proceeds to resolve her tax liability with the Commonwealth of Virginia. Way, who was "expecting [that] there was going to be some money available," J.A. 76, tried to broker a deal whereby Virginia would accept a discounted amount in satisfaction of the entire $109,000 tax debt. Specifically, Way hoped Virginia would accept a lump sum payment of $80,000, the remainder of the insurance proceeds. Martin told Way that the initial $25,000 payment from Hanover was used to pay her employees' wages. In fact, Martin transferred $17,000 to her home equity line at Albemarle First Bank and $8,000 to Detamore, who then issued a check in approximately the same amount to Martin's mortgage company.

Agents from the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") investigated the fire jointly with local officials. Special Agent Hine, who examined the scene within a week of the fire, testified as an expert on the subject of the cause and origin of fires. Agent Hine concluded from examining the remains of the building that the fire started in the loft area of the Swissway Market. He noted that there was very little fire damage

to the contents in the lower part of the store; that any significant damage was caused by the upper portion of the structure collapsing and falling down; and that the soot and burn markings were far heavier in the upper part of the structure.

As for the cause of the fire, Agent Hine ultimately classified the fire as "incendiary," i.e., one that was intentionally started. Although the cause of the fire was classified as "undetermined" when investigators first left the scene, this was merely an initial and preliminary classification. Agent Hine explained that, "[a]s a fire investigator, [I] want to try to get every piece of information [I] can from witnesses, from the fire scene, any forensic analysis that is done before [I] make a final determination." J.A. 338. Once the investigation was complete, Hine concluded that the cumulative facts demonstrated that someone set the fire intentionally: the loft door was open during the fire and the ladder was in place to provide access to loft, where the fire started; no ignitable liquids were stored in the loft that could have accidently ignited; an electrical engineer examined the scene, determined the power to the compressors and the lighting in the loft was off during the fire and ruled out an electrical cause; and Martin had been inside of the store mere moments before the fire was observed 20 feet above the roof line.

In December 2003, investigators interviewed Martin for the first time. Martin claimed that she had not been in the loft at the Swissway Market for two years and had not gone into the loft on the night of the fire either. She also suggested that she had experienced problems with the circuit breakers. Martin claimed that her business was improving and generally doing well, denied that she was experiencing financial problems and told agents that her tax problems with Virginia "had been resolved and . . . taken care of," J.A. 115, and that the IRS actually owed her a refund of $10,000. In March 2004, investigators conducted a follow-up interview during which Martin revealed new claims, most notably that Tom Snoddy stole her keys to the Swissway Market right before the fire.

The Court further observed:

The record contains evidence suggesting that the fire was not the result of arson. For example, Richard Chance, a fire scene investigator for insurance companies, appeared at trial on behalf of Martin and opined that he did not see any evidence of an incendiary origin; however, he acknowledged that he knew nothing about Martin's dire financial straits and admitted such information

4

> would have influenced his review of the evidence. Martin also presented expert testimony from an electrical engineer who indicated he could not rule out an accidental cause of the fire.

On May 25, 2005, a grand jury returned an indictment against Martin charging her with arson, in violation of 18 U.S.C. § 844(i); using fire to commit mail fraud, in violation of 18 U.S.C. § 844(h); mail fraud, in violation of 18 U.S.C. § 1341; and two counts of making false statements to a Federal Agent, in violation of 18 U.S.C. § 1001(a)(2). Martin pleaded not guilty to all counts, and proceeded to trial, which this Court held from May 30 to June 1, 2006. The jury found Martin guilty on all counts. After a sentencing hearing on July 11, 2006, the Court sentenced Martin to 60 months each for Counts One, Three, Four, and Five, all to run concurrently. The Court further sentenced Martin to 120 months for Count Two, to run consecutively with all other counts, reflecting the mandatory statutory minimum sentence required by her conviction for Using Fire to Commit Mail Fraud. Martin's total sentence was 180 months imprisonment.

Martin appealed to the United States Court of Appeals for the Fourth Circuit, arguing that the evidence was insufficient to support the jury's conclusion that she caused the fire upon which her arson and using fire convictions were based, and that the Court imposed multiple punishments for the same offense in violation of the Double Jeopardy Clause. The Fourth Circuit affirmed her conviction and sentence on April 15, 2008. United States v. Martin, 523 F.3d 281 (2008). Martin filed a petition for a writ of certiorari in the United States Supreme Court on July 10, 2008, and the Supreme Court denied her petition on October 6, 2008. Id.

Martin timely filed the instant § 2255 motion alleging the she received ineffective assistance of counsel on two grounds: (1) trial counsel's abandonment of zealous advocacy, and

5

(2) trial counsel's failure to adequately investigate, interview witnesses, and prepare for trial, the result of which denied Martin a meaningful opportunity to present a complete defense.

## II. Standard of Review

### a. Section 2255 Motion

To succeed on a § 2255 motion, a petitioner must prove, by a preponderance of the evidence, that her sentence was imposed in violation of the Constitution or laws of the United States. 28 U.S.C. § 2255; Jacobs v. United States, 350 F.2d 571, 574 (4th Cir. 1965). A pro se petitioner is entitled to have her allegations construed liberally. Gordon v. Leeke, 574 F.2d 1147 (4th Cir. 1978). A habeas petitioner is "entitled to an evidentiary hearing only to resolve disputed issues of material fact," and therefore, will not warrant a hearing unless she first presents "a colorable claim to relief by showing that the alleged additional facts, if true, would at least arguably compel the granting of the writ." Poyner v. Murray, 964 F.2d 1404, 1422 (4th Cir. 1992). However, where the petitioner's motion, viewed against the record, plainly does not state a claim for relief, the court must summarily dismiss the motion without an evidentiary hearing. Rules Governing § 2255 Motions, Rule 5(b).

### b. Summary Judgment

The Court must consider a motion to dismiss submitted with additional affidavits or documents outside the pleadings as a motion for summary judgment governed by Rule 56 of the Federal Rules of Civil Procedure. Fed. R. Civ. Pro. 12(d). The United States submitted materials outside of the pleadings, including a transcript and an affidavit from Martin's trial counsel and, therefore, its motion to dismiss must be converted to a motion for summary judgment. Id.

Summary judgment is only proper where "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing a motion for summary judgment, the Court views the facts and inferences to be drawn from those facts in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). The Court looks to the affidavits and other specific facts to determine whether there is a genuine issue of fact in the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

**III.    Analysis**

Ineffective assistance of counsel claims generally cannot be raised on direct appeal and are properly addressed on collateral review. Massaro v. United States, 538 U.S. 500, 504 (2003) (holding that federal habeas petitioner may bring ineffective assistance claim in § 2255 proceedings whether or not he could have raised the claim on direct appeal).

Martin bears the burden of establishing that her counsel's failure rose to the level of a Sixth Amendment violation under Strickland v. Washington, 466 U.S. 668, 687 (1984). Strickland establishes a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. Moreover, a habeas petitioner must overcome the presumption that counsel's actions, even if ultimately erroneous, were acceptable trial strategy rather than constitutionally deficient performance. Id.

To prevail on an ineffective assistance of counsel claim, a habeas corpus petitioner must satisfy the two-pronged test set forth in Strickland. First, petitioner must show "that counsel's performance was deficient," meaning that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687. Second, petitioner must show "that the deficient performance prejudiced the

defense" to the extent that he was deprived of a fair trial. Id. In this case, Martin must show that there is a reasonable probability that, but for her attorney's alleged mistakes, she would not have been convicted. Hill v. Lockhart, 474 U.S. 52, 58–59 (1985). If it is clear that petitioner has not satisfied one prong of the Strickland test, the court need not inquire whether he has satisfied the other prong. Id. at 697. An attorney's acts or omissions "that are not unconstitutional individually cannot be added together to create a constitutional violation." See Fisher v. Angelone, 163 F.3d 835, 852–53 (4th Cir. 1998).

### a. Ineffective Assistance of Counsel at Trial

Martin asserts that her counsel was ineffective both at trial and at sentencing. She alleges that counsel was ineffective at trial for 1) conducting a limited investigation that failed to develop an adequate defense; 2) failing to meet with Martin or keep her reasonably informed of the proceedings; 3) failing to file a proffer of the excluded testimony of Tom Snoddy; and 4) failing to prepare and adequately question Martin's expert witnesses and ineffectively cross-examine the government's witnesses. However, Martin fails to demonstrate that counsel's conduct fell below an objective standard of reasonableness or that there is a reasonable probability that, but for counsel's alleged errors, a jury would not have found her guilty. Thus, Martin's claims fail.

Martin has provided no evidentiary support for her claim that counsel's lack of investigation hampered her defense. To succeed on a habeas claim of ineffective assistance, a petitioner "must come forward with some evidence that the claim might have merit. Unsupported, conclusory allegations do not entitle a habeas petitioner to an evidentiary hearing." Nickerson v. Lee, 971 F.2d 1125, 1136 (4th Cir. 1992); see Zettlemoyer v. Fulcomer, 923 F.2d 284, 301 (3d Cir. 1991) ("bald assertions and conclusory allegations do not provide sufficient

ground . . . to require an evidentiary hearing"; contrary rule would "encourage meritless petitions burdening judicial resources"). Further, counsel's uncontroverted testimony is that he read, as preliminary preparation, "thousands of pages" of Martin's financial records disclosed by the government, reviewed grand jury testimony from lay and expert witnesses, personally interviewed some witnesses, and spoke with Martin on several occasions to initially shape his theory of defense. Dkt. 139, Ex. 1, at 1. Counsel then ordered and reviewed arson textbooks, interviewed more witnesses, and discussed the case with defense witnesses on several occasions. Id. at 4. It is apparent from the evidence before the Court that counsel's level of preparation and investigation did not fall below an objective standard of reasonableness. Because Martin only summarily alleges incomplete preparation and demonstrates no specific evidence to show that counsel's investigation was so incomplete that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," Strickland, 466 U.S. at 687, the Court must dismiss this claim.

Martin's second claim, that counsel failed to meet with Martin or keep her reasonably informed of the proceedings, is equally unsupported. Martin points to the fact that counsel's records indicate that he met with Martin three times in person prior to the week before trial, and telephoned her six times in the same period, to demonstrate counsels "lack of attention to preparation of a vigorous defense." Dkt. 127-3, at 6. However, the Court cannot conclude that nine conversations, plus additional consultations in the week immediately preceding trial, did not afford counsel the time needed to adequately prepare a defense. Martin has not demonstrated, therefore, that counsel's actions fell below an objective standard of reasonableness in this case. Moreover, she has not demonstrated that had counsel met with her even more often, there is a reasonable probability that the outcome of her trial would have been different.

Martin also alleges that counsel failed to keep her informed about the progress of her case and failed to explain adequately the unlikelihood of success at trial or that the potential ramifications of a guilty verdict included a ten-year mandatory minimum sentence. Martin argues that had counsel done so, "it is probable that she would have accepted the plea bargain . . . and receiv[ed] a sentence of eighteen months." Id. at 14. However, the evidence before the Court contradicts Martin's argument. During Martin's arraignment, the prosecutor explained the potential ramifications of a guilty verdict to Martin. After reviewing an audio recording of Martin's arraignment, it is evident that the prosecutor informed Martin that if she was found guilty, she was subject to a ten-year mandatory minimum sentence in addition to any sentence imposed for her other charges. In response, Martin's counsel acknowledged he was also aware of the ten year mandatory minimum. Even if Martin's counsel had failed to explain to her the potential ramifications of a guilty verdict, the Court finds these ramifications were adequately explained to Martin during arraignment. Thus, Martin fails to demonstrate any prejudice under the second prong of Strickland, and this claim must be dismissed.

Martin's next claim, that counsel's failure to timely file a proffer of excluded testimony by Tom Snoddy prejudiced her, must also be dismissed. Had counsel timely filed the proffer, the excluded testimony would have been available for the Court of Appeals' evaluation. The proffered testimony stated that Snoddy suspected others of being involved, namely a Robbie Chisholm, who had once lent a floor buffer to Martin that she had not returned. Dkt. 139-1, at 12. Snoddy would have also testified that the building owner, Heinz Gadient, was involved. Id. The proffer concluded with counsel's statement that had counsel been permitted to question Snoddy on those issues, his answers would have illustrated his delusions about the fire, and diminished Snoddy's credibility. Id.

However, the only issue to which Snoddy's testimony could have possibly been relevant was whether the evidence against Martin was sufficient to support her conviction. Martin does not allege, nor does the Court find, that the Court of Appeal's decision would have been different had it considered Snoddy's excluded testimony. In finding that the evidence supported Martin's conviction, the Court of Appeals' decision did not heavily rely on Snoddy's direct testimony. The Court of Appeals noted that "there is plenty of strong circumstantial evidence that would permit a reasonable jury to [convict] Martin," including overwhelming evidence of financial motive, Martin's access to the loft where the blaze originated just minutes before the fire started, evidence that Martin lied to investigators, and expert testimony stating that the fire was intentionally set. 523 F.3d at 289. Because Martin cannot demonstrate that the outcome would have been different had counsel timely filed the proffer, she cannot demonstrate prejudice. This claim thus fails the second prong of Strickland and must be dismissed.

Martin's final claim that counsel was ineffective at trial concerns counsel's interactions with, and direct examination of, defense expert witnesses Richard Chance and Linwood Parham, and counsel's allegedly deficient cross-examination of the government's expert witnesses. Martin claims that counsel was ineffective because he failed to investigate properly, resulting in the government's discrediting Chance's testimony on cross-examination, which in turn torpedoed Martin's theory of an accidental fire. Martin's counsel retained Chance and Parham as expert witnesses, and they initially reported that the fire was likely caused by the water heater. On cross-examination, however, the government elicited the fact that neither expert had actually investigated the water heater itself. The government's experts had previously testified that it would have been impossible for the fire to have originated near the water heater. The fact that Chance had never directly examined the water heater came as a surprise to counsel, who admits

11

he never thought to ask Chance if he had examined the water heater. Martin alleges that counsel should have realized that the experts' theory was insufficient and, thus, should have commissioned a new expert investigation.

Martin, however, fails to demonstrate that she would have been acquitted had counsel realized that the defense experts had not physically examined the water heater, or that she would have been acquitted had counsel retained another expert. While the Court recognizes that "Martin's defense depended on [the defense's] ability to convince the jury that the government's experts might be wrong in concluding that the fire [w]as 'arson,'" Dkt. 127-3, at 11, there was copious evidence introduced at trial from which a reasonable jury could find Martin guilty, even if a defense expert had testified to the contrary. Because Martin cannot demonstrate that her counsel's actions prejudiced her, this claim must be dismissed.

Likewise, Martin's allegation that counsel's cross-examination actually bolstered the government's case does not entitle her to relief under Strickland. "Decisions whether to engage in cross-examination, and if so to what extent and in what manner, are similarly strategic in nature." United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987). "Moreover, counsel's tactical decisions at trial, such as refraining from cross-examining a particular witness or from asking a particular line of questions, are given great deference and must similarly meet only objectively reasonable standards." Dows v. Wood, 211 F.3d 480, 487 (9th Cir. 2000). The Court cannot conclude that counsel was constitutionally ineffective because his cross-examination elicited answers with which Martin disagreed. Without alleging a specific instance where counsel's questioning was objectively unreasonable, Martin's claim fails the Strickland test and must be dismissed.

### b. Ineffective Assistance of Counsel at Sentencing

Martin alleges that her counsel was ineffective at sentencing for 1) failing to verify or object to the presentence investigation report, and 2) failing to petition the Court for a mental examination of Martin early enough to present mental health evidence to the Court in mitigation of punishment. However, Martin fails to demonstrate that counsel's conduct fell below an objective standard of reasonableness or that there is a reasonable probability that counsel's actions prejudiced her. Thus, Martin's claims fail.

The presentence investigation report ("PSR") noted that Count One carried a mandatory minimum term of 60 months incarceration and that Count Two carried a mandatory minimum term of 120 months incarceration that must be served consecutively to any other term imposed. The PSR also determined that Martin's total guideline range of imprisonment was 183 to 198 months, which included the mandatory consecutive 120-month term as to Count Two. The trial judge ultimately sentenced Martin to 180 months, which reflected the mandatory minimum sentence and was less than the minimum guideline range determined by the PSR. As a result, Martin's counsel did not to object to the imposed sentence and determined "the concept of 'mitigation' in sentencing [was] essentially meaningless. Judge Moon could not have sentenced [Martin] less time than he did." Snook Aff., Dkt. 139-1, at ¶ 22.

Martin first alleges her counsel failed to verify or object to the PSR; however, she does not provide any supporting evidence. Martin does not specify any inconsistency or error in the presentence investigation report that her counsel failed to notice, had he noticed, would have changed the sentencing outcome. Additionally, after carefully reviewing the U.S. Sentencing Guidelines and the PSR, the Court finds no errors in the report and finds that the PSR properly

calculated a sentencing guideline minimum of 183 months.[*] Martin has not demonstrated that counsel's failure to object to the PSR was either objectively unreasonable or prejudicial to her. Therefore, this claim must be dismissed.

Martin further claims that her counsel failed to timely petition the Court for a mental examination of Martin. As a result, Martin alleges she was prejudiced because the Court could not consider her mental condition as a mitigating factor during sentencing. The U.S. Sentencing Guidelines states that "[m]ental and emotional conditions are not ordinarily relevant in determining whether a departure [from the guidelines] is warranted," U.S.S.G. § 5H1.3, except if "present to an exceptional degree." U.S.S.G. § § 5K2.0(a)(4). However, Martin fails to show that, but for her counsel's alleged deficiency, her sentencing would have been different. Martin merely asserts that her counsel failed to petition the court for a psychiatric examination until the day of sentencing and as a result, "no mitigating evidence in relations thereto could be used." Dkt. 127-3, at 17. However, Martin does not provide any additional, specific evidence suggesting her mental condition was exceptional. Thus, this Court finds that Martin's claim fails to show counsel's actions prejudiced her under Strickland and must be dismissed.

---

[*] Martin was charged with Arson (Count One), Using Fire to Commit Mail Fraud (Count Two), Mail Fraud (Count Three), and two counts of Making False Statements to a Federal Agent (Count Four and Five). Pursuant to the U.S.S.G. §§ 3D1.2(d) and 3D1.3(b) (2005), Counts One, Three, Four, and Five were properly grouped for the purpose of determining the base offense level. Count Two was properly excluded from the grouping because it required a specific term of imprisonment to be imposed consecutively. According to U.S.S.G. § 3D1.1(b)(1) (2005), "[a]ny count for which the statute (A) specifies a term of imprisonment to be imposed; and (B) request that such term of imprisonment be imposed to run consecutively to any other term of imprisonment." Further, U.S.S.G. § 2K2.4(a) (2005) states a "defendant convicted of violating section 844(h) of title 18 . . . the guideline sentence is the term of imprisonment required by statute." Under 18 U.S.C. § 844(h), violation of this statute requires a mandatory minimum of ten years. Taking into account the charges against Martin, which called for a base offense level of twenty-four, and that Martin obstructed justice by lying to the ATF investigators, which increased Martin's base level by two levels, Martin's total offense level was properly calculated to be twenty-six. Accordingly, the sentencing guidelines required an imprisonment range of sixty-three to seventy-eight months for Count One, Three, Four, and Five in addition to the mandatory 120 months imposed by Count Two totaling a minimum of 183 months.

**IV. Conclusion**

For the stated reasons, the Court grants the United States' motion to dismiss dismisses Martin's § 2255 motion.

The Clerk is directed to send copies of this memorandum opinion and the accompanying final order to the parties.

Entered this ___3rd___ day of March, 2011.

_____
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE